1  DIMITRIOS P. BILLER (142730)
2  LDT Consulting, Inc.
   15113 Sunset Blvd.
3  Pacific Palisades, California 90272
4  Telephone: (310) 459-9870
   E-mail: biller_ldtconsulting@verizon.net
5

6

7  Attorney for Plaintiffs PDTW, LLC
   and Paula Thomas
8
                    UNITED STATES DISTRICT COURT
9

10    FOR THE CENTRAL DISTRICT OF CALIFORNIA (WESTERN DIVISION)

11

12

13 | PDTW, LLC, AND PAULA THOMAS,      | Case No.: Case No.: 2:17-cv-04158-
                                        JAK-PJW
14 |       PLAINTIFFS,

15 | VS.                                | **PLAINTIFF PDTW, LLC AND
                                          PAULA THOMAS' FOR JUDICAIL**
16 | [1] RICHARD PEDDIE, AN            | **NOTICE OF JUDGMENT FROM**
17 | INDIVIDUAL; [2] LAW               | **COURT IN QUTAR IN SUPPORT**
     STUDIOS/RICHARD BYRON              **OF PLAINTIFFS' (1) OPPOSITION**
18 | PEDDIE, A BUSNESS ORGANIZED       | **TO EX PARTE APPLICATIONS**
19 | UNDER THE LAWS OF THE STATE       | **FOR ORDERS TO STAY**
     OF COLORADO; [3] STEPHEN CHOI,     **DISCOVERY; (2) MOTION FOR**
20 | AKA HILLSHORE INVESTMENT,         | **PRELIMINARY INJUNCTION;**
21 | S.A. [DUMMY CORPORATION]; [4]     | **(3) MOTION FOR CRIMINAL**
     ENILUZ GONZALEZ, AN                **CONTEMPT; (4) MOTION TO**
22 | INDIVIDUAL; [5] DESNA             | **STIKE THE MOTION TO STAY**
23 | INVESTMENT, LLC; [6] JAMES
24 | ARTIANO; [7] DAVID SCHNIDER, [8]  | **Date: August 31, 2020**
     LAW OFFICE OF DAVID SCHNIDER,      **Time: 8:30 a.m.**
25 | [9] LAW FIRM IN CALIFORNIA,       | **Place: Courtroom 10B**
26 | NOLAN HIEMANN, LAW FIRM IN
27 | CALIFORNIA; [10] JENE PARK, AN

28

**PLAINTIFFS REQUEST FOR JUDICIAL NOTICE**                                    1

| | | |
|---|---|---|
| 1 | INDIVIDUAL; [11] THE PALLIATIVE, A LIMITED LIABILITY COMPANY; [12] STEVE PRESTEMON; [13] KF PROFESSIONAL; [14] NORMAN KO; [15] JOESPH FOSTER; [16] KYU HONG KIM, CPA, INC. [17] KYU HONG KIM; [18] ALLISON KIM; AN INDIVIDUAL, [19] PETER BALLAS; [20] PETER W. BALLAS & ASSOCIATES, INC.; [21] KRING & CHUNG, INC.; [22] KENNETH CHUNG; [23] ALLYSON THOMPSON; [24] LAURA HESS; [25] LAURA BOOTH; [26] MISTY ISAACSON; [27] PAGTER & PERRY ISAACSON; [28] ROGER KUO; [29] ZTHER INTERACTIVE; [30] IAN CHIN; STANLEY DUCK, LLC; [31] DOUG LEE; [32] DSRB, LLC; [32] ALEX KIM; [33] RICHARD KIM; [34] ERIC CHOI; [35] 317 MBP, LLC [DUMMY COMPANY TO PROTECT CHOI'S ASSETS]; [36] BENJIMEN KIM; [37]; LAUNCHPAD COMMUNICATIONS [38] CONSUMER RESOURCE NETWORK, [39] KHONDKER SHOEB AHMED, [40] ANDREW APFELBERG; [41] GREENBERG GLUSTER; *[42] CHOI ASSOCITE-IN-FACT-ENTERPRISE;* [43] JAY YU; [44] DANNY KIM [45] UNITED PLUS INSURANCE; [46] THOMAS WYLDE, LLC; [47] LAW OFFICE OF RICHARD KIM; DOES 1 - 100 <br><br> DEFENDANTS. | Date: October 26, 2020<br>Time: 8:30 a.m.<br>Place: Courtroom 10B<br><br>Date: November 9, 2020<br>Time: 8:30 a.m.<br>Place: Courtroom 10B<br><br><br>**BEFORE THE HONORABLE DISTRICT COURT JUDGE JOHN A. KRONSTADT** |

PLAINTIFFS REQUEST FOR JUDICIAL NOTICE                                    2

**PLAINTIFFS PDTW, LLC AND PAULA THOMAS HEREBY**

**REQUEST** that the United States District Court take Judicial Notice of findings
of fact from the "**CIVIL AND COMMERCIAL COURT OF THE QATAR
IFINANCIAL CENTRE FIRST INSTANC CIRCUIT**" in the case of (1) MS
Ileana Mercedes D'Lacoste Agudelo and (2) Ms. Eniluz Jhoana Gonzalez Aponte
(Claimants) and (1) Horizon Crescent Wealth, LLC, (2) Patrick Baeriswyl, and (3)
Jean Marc Mantegani and QATAR FINANCIAL CENTRE REGULATOR
AUTHORITY.  **(Exhibit "1").**

This Request for Judicial Notice is made in support of Plaintiffs' (1)
Oppositions to the Ex Parte Applications of Protective Order/Stay; (2) Motion for
Criminal Contempt; (3) Motion for Preliminary Hearing; (4) Motion to Strike the
Motion to Stay.

Dated: June 15, 2020

Respectfully submitted,

By: /S/ Dimitrios P. Biller
Paula Thomas, PDTW, LLC

# I.

## INTRODUCTION

On Sunday, June 14, 2020 Plaintiffs' counsel received information from the Organized Crime and Corruption Reporting requesting an interview.  It was at that time I learned about a complaint that Eniluz Gonzalez filed in Qatar seeking nearly $10,000,000.00 from a Trust Account; she changed the name of the Trustee to herself.  The Court would not issue an Order releasing nearly $6,500,000.00 because Gonzalez was not forthright with documents to prove the money was truly trustee money as oppose from illegal sources.  Plaintiffs seek judicial notice of the Trial Court's Judgment and Court of Appeal's Opinion.

# II.

## BACKGROUD

This case involves a RICO Act claim against Eniluz Gonzalez and Stephen Choi, among many others.  Plaintiffs allege that Eniluz Gonzalez was an instrumental partner in crime with her husband (Stephen Choi). Plaintiffs have presented promissory notes, lines of credit, and bank statements to the Court to substantiate their position that Eniluz Gonzalez, Stephen Choi and the Choi-Associate-in-fact-Enterprise.  Plaintiffs alleged this criminal organization committed tax evasion on PDTW, LLC by claiming Thomas Wylde, LLC

"advanced" PDTW, LLC $1,752,000.00 million on its 2014 tax returns and it claim Thomas Wylde, LLC advance another "4,052,052.00 million on its tax return for 2014. Thomas Wylde, LLC's CPAs engaged in the same tax evasion ploy on the 2015 tax returns for Thomas Wylde, LLC. Plaintiffs have alleged that Gonzalez and Choi stole the IP from Thomas Wylde Holdings, LLC through a fraudulent promissory note of $2 million by using the IP as collateral and Gonzalez the beneficiary when Thomas Wylde, LLC defaulted on the note.

## III.

## JUDGMENT AGAINST ENILUZ GONZALEZ

Many findings of fact were made by the Court that are highly relevant in these proceedings. The Court stated:

"Subject to that, the following events appear to be undisputed so far as these applications are concerned."

16.   Ms. Gonzalez Aponte Established the Criteria Investment Trust. The Criteria Investment Trust identifies the Protector as Ms. Gonzalez Aponte and the trustee as HCW.

17.   It appears that between May and August 2017 Ms. D'Lacoste Agudelo transferred a total of €*5,114,393* to be held subject to the OA Investment Trust, and Ms. Gonzalez Aponte transferred to

total of *€7,414,393.00 euro* (emphasis added) to be held subject to the

Criteria Investment Trust.

18.     Between about 17 January 21 February 2018 HCW

transferred a total of *€2,750,00* to Ms. D'Lacoste Agudelo and

1,8000,00 to Ms. Gonzalez Aponte.  The Claimants contend that they,

by the end of February 2018, HCW held *€2,362,393* in the OA

Investment Trust as trustee for Ms. D'Lacoste Agudelo and 5,614 in

the Criteria Investment trustee as trustee for Ms. Gonzalez Aponte.

19.     According to the QRCRA [Qatar Financial Centre

Regulatory Authority][1], on 22 February 2018 it commenced an

---

[1] The QFC Authority is the commercial and strategic arm of the Qatar Financial Centre ("QFC"). The QFC also consists of an independent financial regulator, the QFC Regulatory Authority, and an independent judiciary comprising a Civil and Commercial Court and a Regulatory Tribunal. The QFC Authority is responsible for leading the expansion of Qatar's financial services sector and for developing relationships with the regional and global financial community. In February 2010 the QFC Authority unveiled a new strategy focusing on the creation of a global business hub for three core markets - Asset Management, Reinsurance and Captive Insurance.

Apart from Qatar itself, which needs to raise the capacity of its financial services to support more than $140 billion worth of projects, the QFC also provides a conduit for financial services providers to access nearly $1 trillion of investment across the GCC as a whole over the next decade. (Wikipedia)

investigation in HCW's activities on the basis of suspected money laundering.  On 22 February 2018, a freezing order was made by the Qatar Central Bank over all of HCT's bank accounts, which was subsequently extended by the Public Prosecutor.  The accounts, including those holding the **funds of the two trusts, remain frozen**."  **(Emphasis added)**

20.    It appears that by deeds dated 15 March 2018 (Ms. Gonzalez Aponte) and 16 March 2018 (Ms. D'Lacoste Agudelo) each Claimant removed HCW as trustee and appointed her in its place."

23.    **On 24 October 2018, the QFCRA applied to be joined to the proceedings. It stated that it was concerned that the funds transferred to HCW on behalf of the Claimants are part of a sophisticated attempt at money laundering and an attempt to evade tax. By order dated 6 December 2018 the QFCRA was joined to these proceedings.** The Claimants have made various requests that the QFCRA provide further information. The QFCRA has provided some documents and has refused some requests. This has been one of the issues on the present applications.  **(Emphasis)**

24. On 11 March 2019 the QFCRA issued its Decision Notice in relation to its investigation against HCW. That identified breaches by HCW of the Anti-Money Laundering and Com batting Terrorist Financing Rules 2010 and included a requirement that HCW pay fines totaling QAR 30,000,000. Although the Decision Notice is directed at HCW and not the Claimants, pursuant to an order of the Court of 15 April 2019, the Decision Notice was disclosed to the Claimants."

25.    It appears that the Claimants have not participated in or otherwise assisted the QFCRA in its investigation. They deny any suggestion that the funds settled in the trusts were in any way illegitimate. No formal allegations have been made against the Claimants and there has been no formal investigation in respect of the Claimants. The Defendants' position has been that QFCRA conjecture that the Claimants may have failed to pay tax in Costa Rica but say that there is no factual basis to accuse the Claimants of tax evasion or any other crime. HCW's position is that its own money laundering checks had excluded the possibility of any participation in any crime related to tax evasion. **The QFCRA's position is that it continues to have concerns as to the true source of the funds in issue in these**

**proceedings, and in particular the nature and circumstances of a settlement agreement that led to the funds ultimately arriving in Qatar**.

30.     Each Claimant seeks an order for summary judgment against HCW in respect of the sums she claims is the balance of the trust fund held by HCW following the January/February 2018 transfers. Ms. D'Lacoste Agudelo seeks judgment now for €2,364,392.72 and Ms. Gonzalez Aponte for €5,614,392.72. At the hearing of these applications Mr. Hatton confirmed that the Claimants were not seeking summary judgment against the Second or Third Defendant.

32.     Mr. Hatton acknowledged that any order for summary judgment should recognize the fact that HCW's accounts arc currently frozen. He clarified the order he is seeking on behalf of Ms. D'Lacoste Agudelo in case 6 in the following terms, namely that:

*"1.     HCW shall transfer to the Claimant, as new trustee of the OA Investment Trust, the balance of the trust fund. being the sum of€ 2,364,392.72.*

*2. Execution of the transfer requirement set out in pa ragraph 1 above*

*shall be stayed pending lifting of the Freezing Order imposed on 22*

*February 2018 and continued thereafter by the Qatar Authorities over*

*the First Defendant's bank accounts or farther order of this Court. "*

The terms of the order Mr. Hatton is seeking in respect of Ms.

Gonzalez Aponte in case 7 is in the same terms save that the figure in

paragraph 1 would be €5,614,392.72.

32.     Mr. Abu Shaikha stated that the Defendants are willing to

pay trust monies to the Claimant but are prevented from doing so

because accounts had been and remain frozen.

35.     **However, particularly in the light of the submissions**

**of Mr. Jaffey QC, the Court considers that it is faced with a more**

**complex picture in this case. In the first place, on the material**

**before it, the Court is unable to make any finding as to the source**

**of the funds lodged with HCW. The funds may be trust money so**

**as to give the Claimants a proprietary claim if the Claimants are**

**legal or beneficial owners of the money. There has been no**

**evidence forthcoming from the Claimants or otherwise to assist**

**the Court with that. Mr. Hatton relies on the fact that no formal**

**investigation has been instituted as regards the Claimants.
However, the source of the funds is an important issue as regards
the investigation into HCW, and the Court has no explanation
from the Claimants as to the source of the funds transferred to
HCW.**

37. It appears however that HCW has not maintained separate
client bank accounts and that trust monies held for the Claimants may
not have been kept separate from other monies held by HCW: in
QFCRA's investigation, the Court was told that HCW employees
admitted that HCW had commingled client funds with its own money.
Thus, it appears that there is not a separate account for either
Claimant's fund. The Defendants accept, in their pleadings, that the
specific sums claimed by the Claimants were held on trust for the
Claimants.

38.     It appears that HCW was holding funds for other clients -
the Court was told possibly 15 others though the Claimants were the
largest clients -who may also have proprietary claims against HCW.
Even assuming that the Claimants have a proprietary claim, on the
state of the evidence the Court cannot be confident that there is in

PLAINTIFFS REQUEST FOR JUDICIAL NOTICE                                           11

HCW's accounts sufficient money to pay the sums now sought by the Claimants, without trespassing on trust funds held on behalf of others. It is not possible for the Court to conduct an exercise of equitable tracing on a summary judgment application.

39.     Applying the test set out above, the Court has concluded that it is not in the interests of justice to grant the Claimants' applications for summary judgment, which therefore fail. The Claimants are, of course, free to pursue their claims to a full hearing should they wish to do so. They should submit suggested directions to the Court following receipt of this decision. The Court will deal with directions on paper without the need for another hearing.

## IV.

## REQUEST FOR JUDICIAL NOTICE

Rule 201 of the Evidence Code determines the scope of judicial notice of an adjudicative fact.  Rule 201 states:

**(a) Scope.** This rule governs judicial notice of an adjudicative fact only, not a legislative fact.

PLAINTIFFS REQUEST FOR JUDICIAL NOTICE                                    12

**(b) Kinds of Facts That May Be Judicially Noticed.** The court may

judicially notice a fact that is not subject to reasonable dispute

because it:

   **(1)** is generally known within the trial court's territorial jurisdiction;

or

   **(2)** can be accurately and readily determined from sources whose

accuracy cannot reasonably be questioned.

**(c) Taking Notice.** The court:

   **(1)** may take judicial notice on its own; or

   **(2)** must take judicial notice if a party requests it and the court is

supplied with the necessary information.

**(d) Timing.** The court may take judicial notice at any stage of the

proceeding.

**Exhibit "1"** was issued by a proper court in Qatar: "IN THE CIVIL AND

COMMERCIAL COURT OF THE QATAR FINANCIAL CENTRE FIRST

INSTANCE CIRCUIT.' The decision was appeal and affirmed. **(Exhibit "2")**

The opinions by both courts are avaible to the public by going to the website for

the Court.  These facts can be determined from sources whose readily and

accurately cannot be reasonably questioned. **(Decl. of Biller)**

In this case, there is a pattern and practice of the same illegal conduct involving the Trust for Eniluz Gonzalez discussed above.  Stephen Choi and David Schnider named Eniluz Gonzalez as the person funding the $2 million promissory note dated December 1, 2014 with Choi's partner Shoeb Ahmend.  On January 7, 2015, Choi and Schnider alleged made Eniluz Gonzalez the "President" and "General Manager" of the dummy company "Hillshore Investment."  Eniluz Gonzalez signed the fake Agreement to Purchase Membership Interests in Thomas Wylde, LLC.  Richard Peddie fabricated the September 28, 2015 letter from allegedly Eniluz Gonzalez attempting to manufacture evidence that Hillshore Investment, S.A. was paying $3,521,000.00 for 3,300 when DESNA Investment, LLC was laundering that amount through Thomas Wylde, LLC.  Eniluz Gonzalez, Stephen Choi, and Shoeb Ahmend money laundered $18.3 million through Thomas Wylde, LLC from August 2014 to July 2017.

The CPA have already been caught committing tax evasion for the benefit of Stephen Choi based on the 2014 tax returns for PTW, LLC showing an alleged advance by Thomas Wylde, LLC to PDTW, LLC for $1,782,000.00 and showing an alleged advance from Thomas Wylde, LLC to PDTW, LLC for $4,052,052.00 in the same year.  The alleged advances never took place because Thomas Wylde, LLC never took a vote in January 2015 to make these alleged advances as

obligated by the Amended Restated Operating Agreement, Clause 7.3. In January 2015, "Hillshore Investment" was not an owner or member, so Paula Thomas' vote to approve of these alleged debts was required and she did not vote.

Richard Peddie will not produce the tax returns for Thomas Wylde, LLC for 2016, 2017, 2018 and 2019. The attorneys for the CPA defendants are playing ignorant; they allegedly do not know who owns the majority units in and who represent Thomas Wylde, LLC?!?!!??!  The CPA Defendants (KF Professional Group, Norman Ko, Joseph Foster, Kyu Hong Kim, CPA, Inc. Kyu Hong Kim and Allison Kim were involved in the planning and early execution of the fraud.

The Judgement and findings of adjudicative facts are relevant to this case. Those finding are relevant evidence of a pattern and practice of transmitting larges sums of money internationally suspect of being the product of money laundering and tax evasion.

Additionally, Gonzalez displayed the same failure to produce relevant documents to prove the money was legitimate and not part of an illegal scheme. That is exactly what Stephen Choi and Gonzalez did in this case, the Superior Court case, and in the bankruptcy proceedings. The findings are evidence of a pattern and practice of concealment of evidence.

## IV.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully take Judicial Notice of the findings of adjudicative facts from the Judgment set forth above.

Dated: June 10, 2020

Respectfully submitted,


/S/ Dimitrios P. Biller
Counsel for Plaintiffs
Paula Thomas and PDTW, LLC

## DECLARATION OF DIMITRIOS P. BILLER

1.   I am Plaintiffs' counsel and have represented Thomas Paula's since 2007. I started to represent PDTW, LLC after Plaintiff received the litigation and privilege rights belonging to PDTW, LLC in the bankruptcy adversary proceedings. I have personal knowledge of the facts, statements, circumstances, and documents described herein.  If called to testify, I would and could provide competent testimony based on my personal knowledge.

2.   On Sunday, June 14, 2020 I received information from the Organized Crime and Corruption Reporting requesting an interview.  It was at that time I learned about a complaint that Eniluz Gonzalez filed in Qatar seeking nearly $6,500,000.00 in a Trust Account held by the Asset Management Company; she changed the name of the Trustee to herself. I searched for the case on the internet and found it with a few minutes.  **Exhibit "1"** is the Trial Court's Judgment and **Exhibit "2"** is the Court of Appeal's Opinion.  The Trial Court's Judgment is dated October 2, 2019 and the Court of Appeal's Opinion is dated **June 9, 2020** (last week).  **Exhibits "1"** and **"2"** are true and correct copies of the Judgment and Opinion I obtained off the website for the Civil And Commercial Court of the Qatar Financial Centre.  I have not changed or altered any language, words,

sentences, paragraphs in anyway.  **Exhibit "1" and "2"** are the exact same copies that I personally received.

3.      The Organized Crime and Corruption Reporting is an international organization of journalist and investigative reporters tracking and reporting on organized criminals.  I have learned that Eniluz Gonzalez has been the subject of an ongoing investigation.

4.      I have deposed Eniluz Gonzalez, issued subpoena duces tecum to her and read documents that she has signed.  The findings of fact in the Judgment discussed supra are consistent with the pattern and practice of money laundering in this case. I caused a subpoena duces tecum to be served on Gonzalez in the Bankruptcy case; she did NOT produce a single piece of paper proving Hillshore Investment, S.A. exists.

5.      I, Dimitrios P. Biller, declare under penalty of perjury under the laws of the state of California that the forgoing is true and correct.  I signed this Declaration on June 15, 2020 in Pacific Palisades, California.


/S/ Dimitrios P. Biller

**PROOF OF SERVICE**
**STATE OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

I declare under penalty of perjury that I live in the County of Los Angeles, state of California, I am over the age of 18 years; my business is located at 15113 West Sunset Blvd., Suite "9", Pacific Palisades, CA 90272.  On **June 15, 2020**, I caused to be served, via e-mail, the following pleadings:

**PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE OF A JUDGMENT AND COURT OF APPEAL ISSUED FROM THE COURTS IN QATAR**

on the interested parties in this action by e-mail:

| | |
|---|---|
| Glen R. Olson<br>Jessica R. Macgregor<br>Johnathan Rizzardi<br>Long & Levit LLP<br>465 California Street, 5rth Floor<br>San Francisco CA 94104 | Kring & Chung<br>Kenneth Chung<br>Allyson Thompson<br>Laura Hess<br>Laura Booth |
| Robert Silver<br>Kaufman Dolowich Voluck LLP<br>11755 Wilshire Blvd., Suite 2400<br>Los Angeles, CA 90025<br>(310) 775-6511 | Defendants David Schnider,<br>Law Office of David Schnider, and<br>Nolan Heimann, LLP |

PLAINTIFFS REQUEST FOR JUDICIAL NOTICE                                                          19

| | |
|---|---|
| rsilver@kdvlaw.com | |
| J. Andrew Wright<br>Chapman Glucksman Dean<br>Roeb Barger, APC<br>11900 W. Olympic Blvd., Suite 800<br>Los Angeles, CA 90064<br>(310) 207-7722<br>awright@egdrblaw.com | Defendants KF Professionals, Inc.,<br>Norman Ko<br>Joseph Foster |
| Michael B. Wilk<br>Lewis Brisbois<br>633 West 5th Street<br>Suite 4000<br>Los Angeles, CA 90071 | Defendants Kyu Hong Kim, CPA, Inc.,<br>Allison Lee (aka Kwan/Kim)<br>Kyu Hong Kim |
| Richard Peddie<br>Law Studios/Richard Byron Peddie<br>5051 Euclid Ave.<br>Boulder, Colorado 80303 | Richard Peddie |
| Richard Peddie<br>Law Studios/Richard Byron Peddie<br>5051 Euclid Ave.<br>Boulder, Colorado 80303 | Stephon Choi<br>Eniluz Gonzalez<br>Doug Lee<br>Roger Kou<br>Jene Park<br>John Hanna |
| Lawrence S. Andrews<br>Artiano & Associates | Peter Ballas<br>Ballas & Associates<br>DESNA Investment, LLC |

| 3828 Carson Street, Suite 102<br>Torrance, CA 90503 | James Artiano<br>Eric Choi |
|---|---|
| Frances O'Merea<br>12100 Wilshire Blvd., Suite<br>1200, Los Angeles, CA 90025 | United Plus Insurance<br>Danny Kim<br>Jay Yu |
| Nemecek-Cole<br>Vikram Sohal<br>Attorney at Law<br>16255 Ventura Blvd., Ste. 300,<br>Encino, CA<br>91436 | Misty Isaacson<br>Pagter & Perry Isaacson |
| Hill, Farrer & Burrill, LLP<br>Keven H. Brogan<br>Dean E. Dennis<br>Elissa L. Gysi<br>One California Plaza<br>300 South Avenue, 37th Floor<br>Los Angeles, California 90071-3147 | Greenberg Glusker<br>Andrew Alpheberg |

**PLAINTIFFS REQUEST FOR JUDICIAL NOTICE** 21

_____BY MAIL – I placed such envelope for deposit in the U.S. Mail for service by the United States Postal service, with postage thereon fully prepaid. I am "readily familiar" with the practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the United States Postal Service on that same day with postage thereon fully prepaid at Pacific Palisades, California. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_____BY FEDERAL EXPRESS – I am familiar with the practice at my place of business for collection and processing of correspondence for overnight delivery maintained by Federal Express. Such correspondence will be deposited with a facility regularly maintained by Federal Express for receipt on the same day in the ordinary course of business. The envelope was sealed and placed for collection and delivery by Federal Express with delivery fees paid or provided for in accordance with ordinary business practices.
_____BY PERSONAL SERVICE – I caused such envelope to be delivered by hand to the offices of the addressee.

**XXX**: E-Mail via EM-ECF

**XXX** (State) I declare **under penalty of perjury under the laws of the State of California** that the foregoing is true and correct.

Executed on **June 15, 2020**, at Pacific Palisades, California.

/S/ Dimitrios P. Biller
Dimitrios P. Biller

PLAINTIFFS REQUEST FOR JUDICIAL NOTICE                                              22

# EXHIBIT

# "1"



QATAR INTERNATIONAL COURT

Neutral Citation: [2019] QIC (F) 9

In the name of His Highness Sheikh Tamim bin Hamad al Thani,

Emir of the State of Qatar

**IN THE CIVIL AND COMMERCIAL COURT**

**OF THE QATAR FINANCIAL CENTRE**

**FIRST INSTANCE CIRCUIT**

2 October 2019

**Case Nos: 6 and 7 of 2018**

### (1) MS ILEANA MERCEDES D'LACOSTE AGUDELO

### (2) MS ENILUZ JHOANA GONZALEZ APONTE

**Claimants**

and

### (1) HORIZON CRESCENT WEALTH LLC

### (2) PATRICK BAERISWYL

### (3) JEAN MARC MANTEGANI

**Defendants**

and

### QATAR FINANCIAL CENTRE REGULATORY AUTHORITY

**Interested Party**

---

**JUDGMENT**

---

**Members of the Court:**
**Justice Frances Kirkham**
**Justice William Blair**
**Justice Rashid Al Anezi**

**ORDER**

1. The Claimants' applications for summary judgment are dismissed;

2. The Claimants' applications to strike out the Defendant's counterclaims are adjourned with permission to apply;

3. The books and records of the Criteria Investment Trust and the OA Investment Trust shall be preserved;

4. The First Defendant shall deliver up to the QFCRA the books and records of the Trusts within 28 days;

5. In the event that the books and records of the Trusts are no longer in the possession, custody or control of the Defendants, a Director of the First Defendant shall produce a witness statement setting out where the records are now held, or the full circumstances of their loss or destruction;

6. The Claimants and the Qatar Financial Centre Regulatory Authority may, at their own expense, make copies of the books and records of the Trusts; and

7. The Claimants' applications for further disclosure by the QFCRA are dismissed.

## JUDGMENT

1. On 26 August 2018, the Claimants, Ms Ileana Mercedes D'Lacoste Agudelo and Ms Eniluz Jhoana Gonzalez Aponte, both residents of Costa Rica, issued separate proceedings, numbered 6 of 2018 and 7 of 2018 respectively. Save for differences between the sums claimed, the issues and underlying facts are identical in both cases. The parties and Court have found it convenient to deal with the two cases simultaneously and in practical terms as if they are one set of proceedings, though there has been no formal joinder of the two cases.

2. The Claimants bring their claims on the basis that they are each a beneficiary of a trust established in May and April 2017 respectively, operated by the First Defendant, Horizon Crescent Wealth LLC ("HCW") as trustee for each Claimant. Their claims against the Second and Third Defendants are brought on the basis that the Second and Third Defendants were, at material times, directors of HCW.

3. HCW is a company established in the Qatar Financial Centre. The Court has jurisdiction under Article 8(3)(C) of the QFC Law, and this is not in dispute. Clause 1 of each of the trust instruments provides that the trusts "...shall be subject to the exclusive jurisdiction of and construed and regulated only according to the laws of the QFC".

4. In each case, the Claimants contend that HCW was in breach of its duties as trustee by failing to transfer to each of them the assets of the relevant trust and to account to them for all other assets and documents of the trust when requested to do so. The Claimants contend that the Second and Third Defendants owed duties (a) to exercise their powers as directors with the degree of care and diligence that a reasonable person would exercise if they were a director of HCW in HCW's circumstances and occupied the office held by and had the same responsibilities within HCW as the director (b) to exercise their powers and discharge their duties in good faith and (c) not improperly to use their position to gain an advantage for themselves or someone else or cause detriment to HCW.

5. The Claimant in case 6, Ms D'Lacoste Agudelo, claims € 2,364,392.72. Ms Gonzalez Aponte, the Claimant in case 7, claims €5,614,392.72.

6. The Defendants' defences are identical (except for the corrections needed explained in paragraph 13 below). HCW accepts (a) that it received sums of money to be held on trust for each Claimant (b) that on 25 March 2018 each Claimant sent a notice removing HCW as trustee and appointing herself in HCW's place and (c) that it was instructed to transfer all funds it held to the bank account in Switzerland of the new trustee. HCW's case is that it was unable to transfer any money as its accounts had been frozen by the authorities.

7. The Second and Third Defendants in each case deny the Claimants' allegations of breach and say that they carried out their duties lawfully.

8. The Defendants allege that they suffered loss and damage resulting from the authorities' suspicions as to the origin of the Claimants' funds, the freezing of HCW's accounts and the QFCRA investigation. These, they say, caused financial loss and reputational damage and caused the Third Defendant be subject to a travel ban. The Defendants counterclaim as follows:

   a. QAR 200,000,000 for HCW

   b. QAR 50,000,000 for the Second Defendant as material and moral damages; and

   c. QAR 30,000,000 for the Third Defendant as material and moral damages.

9. Each Claimant rejects the basis of the Defences and denies liability to the Defendants on their counterclaims.

10. The Qatar Financial Centre Regulatory Authority ("QFCRA") applied to be joined to both cases on the ground that its participation would assist the Court among other things by putting relevant information before the Court. On 6 December 2018 the Court ordered that QFCRA be joined as a party to the proceedings. The QFCRA does not seek any relief in either case 6 or case 7 or intend to play an active role.

11. The Claimants in each case have issued an application seeking the following relief, namely that:

    a.  the Defendants' counterclaims be struck out;

    b.  summary judgment be entered on their claims;

    c.  there be consideration whether the Defendants complied with the requirements of a freezing order which the Court made on 9 May 2019; and

    d.  the QFCRA provide information and disclosure to the Claimants.

12. We have been much assisted at the hearing of these applications by Mr Simon Hatton for the Claimants, Mr Abu Shaikha for the Defendants and Mr Ben Jaffey QC for the QFCRA.

**Corrections**

13. A correction is needed to the Statement of Case in Ms D'Lacoste Agudelo's claim (case no.6). The figure of 2,000,000.00 Euro in paragraph 6 should read 200,000 Euro.

14. Names and numbers were transposed in the defences.   At the hearing of these applications Mr Abu Shaikha confirmed on behalf of the Defendants that the following corrections, simply to correct transpositions, should be made to the Defences and Counterclaims:

    a.  case no. 6, where the Claimant is Ms D'Lacoste Agudelo, the figure of €5,614,392.72 in paragraph 15 of the Defence and Counterclaim should read €2,364,392.72;

    b.  case no. 7, where the Claimant is Ms Gonzalez Aponte, the figures in paragraph 7.3 of the Defence and Counterclaim should read €5,614,392.72 not €2,364,392.72;

    c.  case no. 6: the name "Ms Aponte" in paragraph 15.1 of the Defence and Counterclaim should read "Ms Agudelo"

    d.  case no. 7: the name "Ms Agudelo" in paragraph 15.1 of the Defence and Counterclaim should read "Ms Aponte ".

**Background**

15. As the Claimants' four applications are all interim applications, no evidence has been formally adduced or tested, though in the usual way the Court has had before it a number of witness statements to which it has had regard. Subject to that, the following events appear to be undisputed so far as these applications are concerned.

16. In April and May 2017 the Claimants established separate trusts with HCW as trustee. Ms D'Lacoste Agudelo established the OA Investment Trust. Ms Gonzalez Aponte established the Criteria Investment Trust. The Criteria Investment Trust identifies the Protector as Ms Gonzalez Aponte and the trustee as HCW. In a letter dated 13 April 2017 Ms Gonzalez Aponte authorised HCW to open a bank account in Qatar for the trust and to accept instructions from her by email. Similarly, the OA Investment Trust identified Ms D'Lacoste Agudelo as Protector and HCW as trustee. By letter dated 3 May 2017 Ms D'Lacoste Agudelo gave similar instructions to HCW as Ms Aponte had done.

17. It appears that between May and August 2017 Ms D'Lacoste Agudelo transferred a total of € 5,114,393 to be held subject to the OA Investment Trust, and Ms Gonzalez Aponte transferred a total of € 7,414,393 to be held subject to the Criteria Investment Trust.

18. Between about 17 January and 21 February 2018 HCW transferred a total of € 2,750,000 to Ms D'Lacoste Agudelo and € 1,800,000 to Ms Gonzalez Aponte. The Claimants contend that, by the end of February 2018, HCW held € 2,362,393 in the OA Investment Trust as trustee for Ms D'Lacoste Agudelo and € 5,614,393 in the Criteria Investment Trust as trustee for Ms Gonzalez Aponte.

19. According to the QFCRA, on 22 February 2018 it commenced an investigation into HCW's activities on the basis of suspected money laundering. On 22 February 2018, a freezing order was made by the Qatar Central Bank over all of HCW's bank accounts, which was subsequently extended by the Public Prosecutor. The accounts, including those holding the funds of the two trusts, remain frozen.

20. It appears that by deeds dated 15 March 2018 (Ms Gonzalez Aponte) and 16 March 2018 (Ms D'Lacoste Agudelo) each Claimant removed HCW as trustee and appointed herself in its place.

21. By letter dated 25 March 2018 Al Tamimi & Co wrote to HCW on behalf of both Claimants giving notice that HCW had been removed as trustee of both trusts. By that letter Al Tamimi & Co instructed HCW to transfer all funds held by them as trustees to accounts in Switzerland in the names of each of the Claimants, who had been appointed as trustees in HCW's place. HCW were also instructed to make all books of account available for collection.

22. HCW responded rejecting the notices removing them as trustees, on the basis that they were unable to operate their bank accounts as HCW's accounts had been frozen on 22 February 2018. The Defendants took no steps to transfer trust books to the Claimants or otherwise arrange for the trusts to be transferred to them as new trustees.

23. On 24 October 2018, the QFCRA applied to be joined to the proceedings. It stated that it was concerned that the funds transferred to HCW on behalf of the Claimants are part of a sophisticated attempt at money laundering and an attempt to evade tax. By order dated 6 December 2018 the QFCRA was joined to these proceedings. The Claimants have made various requests that the QFCRA provide further information. The QFCRA has provided some documents and has refused some requests. This has been one of the issues on the present applications.

24. On 11 March 2019 the QFCRA issued its Decision Notice in relation to its investigation against HCW. That identified breaches by HCW of the Anti-Money Laundering and Combatting Terrorist Financing Rules 2010 and included a requirement that HCW pay fines totalling QAR 30,000,000. Although the Decision Notice is directed at HCW and not the Claimants, pursuant to an order of the Court of 15 April 2019, the Decision Notice was disclosed to the Claimants.

25. It appears that the Claimants have not participated in or otherwise assisted the QFCRA in its investigation. They deny any suggestion that the funds settled in the trusts were in any way illegitimate. No formal allegations have been made against the Claimants and there has been no formal investigation in respect of the Claimants. The Defendants'

position has been that QFCRA conjecture that the Claimants may have failed to pay tax in Costa Rica, but say that there is no factual basis to accuse the Claimants of tax evasion or any other crime. HCW's position is that its own money laundering checks had excluded the possibility of any participation in any crime related to tax evasion. The QFCRA's position is that it continues to have concerns as to the true source of the funds in issue in these proceedings, and in particular the nature and circumstances of a settlement agreement that led to the funds ultimately arriving in Qatar.

26. Although HCWs accounts remain frozen, the Claimants have expressed concern that the fines imposed by the Decision Notice may be satisfied by payment out of these accounts, which, they claim, include the Claimants' money. By Order dated 8 May 2019, on application by the Claimants, the Court issued an injunctive order against HCW prohibiting it from removing from Qatar any of its assets in Qatar. The Order required HCW to inform the Claimants of all assets exceeding QAR 35,000 and of all deposits received by HCW from or on behalf of the Claimants and all transfers made by them of the Claimants' money including funds held in the Criteria Investment Trust and OA Investment Trust. HCW has not provided that information to the Claimants.

27. The QFCRA informed the Court that it is not aware of any evidence which suggests that funds subject to the Court's injunctive order dated 8 May 2019 have been dissipated.

28. On 10 May 2019 HCW lodged at the Regulatory Tribunal an appeal against the Decision Notice. The Court understands that this appeal is proceeding, but has not yet been determined.

29. It appears that HCW is no longer trading. This has some significance for the matters which the Court has to decide. It appears that HCW was holding itself out as carrying on asset management, QFCRA says without authorisation. Be that as it may, issues may arise as to whether the monies presently in frozen accounts in HCW's name are sufficient to meet all its obligations even aside from the fines.

**Application for summary judgment**

30. Each Claimant seeks an order for summary judgment against HCW in respect of the sums she claims is the balance of the trust fund held by HCW following the January/February 2018 transfers.  Ms D'Lacoste Agudelo seeks judgment now for €2,364,392.72 and Ms Gonzalez Aponte for €5,614,392.72.  At the hearing of these applications Mr Hatton confirmed that the Claimants were not seeking summary judgment against the Second or Third Defendant.

31. Mr Hatton acknowledged that any order for summary judgment should recognise the fact that HCW's accounts are currently frozen.  He clarified the order he is seeking on behalf of Ms D'Lacoste Agudelo in case 6 in the following terms, namely that:

> "1.  HCW shall transfer to the Claimant, as new trustee of the OA Investment Trust, the balance of the trust fund, being the sum of € 2,364,392.72.
>
> 2.  Execution of the transfer requirement set out in paragraph 1 above shall be stayed pending lifting of the Freezing Order imposed on 22 February 2018 and continued thereafter by the Qatar Authorities over the First Defendant's bank accounts or further order of this Court."

The terms of the order Mr Hatton is seeking in respect of Ms Gonzalez Aponte in case 7 is in the same terms save that the figure in paragraph 1 would be €5,614,392.72.

32. Mr Abu Shaikha stated that the Defendants are willing to pay trust monies to the Claimant, but are prevented from doing so because accounts had been and remain frozen.

33. The basis on which the Court gives summary judgment is set out in Practice Direction 2 /2019 (so far as relevant) as follows:

> "In accordance with Article 22.6 of the Rules, the Court may, if it considers that justice so requires, give summary judgment on a claim ... if – (a) it considers that –
>
> (i) the defendant to the claim ... has no prospect of successfully defending the claim."

Recent examples of summary judgment given by the Court include *Blom Bank Qatar LLC v Qatar Asphalt Company WLL*, Case No 9 of 2018 (10 April 2019), permission to appeal refused 14 July 2019, and *Leonardo S.p.A v Doha Bank Assurance Company LLC*, Case No 3 of 2019 (5 September 2019).

34. The Claimants submit that these principles plainly apply in the present case. The case, they submit, is a straightforward one in which a former trustee (HCW) has failed to transfer trust monies at new trustees' request. The former trustee does not dispute that the monies are trust monies and that it is bound to comply with the request – simply that it is unable to do so, the relevant accounts being frozen.

35. However, particularly in the light of the submissions of Mr Jaffey QC, the Court considers that it is faced with a more complex picture in this case. In the first place, on the material before it, the Court is unable to make any finding as to the source of the funds lodged with HCW. The funds may be trust money so as to give the Claimants a proprietary claim if the Claimants are legal or beneficial owners of the money. There has been no evidence forthcoming from the Claimants or otherwise to assist the Court with that. Mr Hatton relies on the fact that no formal investigation has been instituted as regards the Claimants. However, the source of the funds is an important issue as regards the investigation into HCW, and the Court has no explanation from the Claimants as to the source of the funds transferred to HCW.

36. Mr Hatton made clear that the Claimants are not seeking damages for breach of trust; their case is simply that HCW were holding funds as trustee, HCW had been replaced; and HCW thus had an obligation to pay over the funds they held as trustee.

37. It appears however that HCW has not maintained separate client bank accounts and that trust monies held for the Claimants may not have been kept separate from other monies held by HCW: in QFCRA's investigation, the Court was told that HCW employees admitted that HCW had commingled client funds with its own money. Thus, it appears that there is not a separate account for either Claimant's fund. The Defendants accept, in their pleadings, that the specific sums claimed by the Claimants were held on trust for the Claimants. There is no evidence however as to the current state of HCW's accounts. Mr Abu Shaikha said that the funds were probably not worth the same now

as had been the case in March 2018, but gave no information to assist with what their value might be. He submitted that, as accounts had been frozen, the Defendants could not know what the position was as regards the trust funds. The evidence before the Court as to how much money is held in HCW's accounts comes from paragraph 5.22 of the Decision Notice which gives what are said to be the then current balances of various HCW bank accounts totalling approximately QAR 26,430,000.

38. It appears that HCW was holding funds for other clients – the Court was told possibly 15 others though the Claimants were the largest clients – who may also have proprietary claims against HCW. Even assuming that the Claimants have a proprietary claim, on the state of the evidence the Court cannot be confident that there is in HCW's accounts sufficient money to pay the sums now sought by the Claimants, without trespassing on trust funds held on behalf of others. It is not possible for the Court to conduct an exercise of equitable tracing on a summary judgment application.

39. Applying the test set out above, the Court has concluded that it is not in the interests of justice to grant the Claimants' applications for summary judgment, which therefore fail. The Claimants are, of course, free to pursue their claims to a full hearing should they wish to do so. They should submit suggested directions to the Court following receipt of this decision. The Court will deal with directions on paper without the need for another hearing.

40. The Claimants also seek an order for immediate delivery of books and records relating to the trusts. Mr Jaffey was concerned to ensure that the QFCRA's position was safeguarded. However, he and Mr Hatton at the hearing agreed the following wording for an order, and which the Court approves:

*"1 The books and records of the trusts shall be preserved;*
*2 The First Defendant shall deliver up to the QFCRA the books and records of the Trusts within 28 days; and*
*3 In the event that the books and records of the Trusts are no longer in the possession, custody or control of the Defendant, a Director of the First Defendant shall produce a witness statement setting out where the records are now held, or the full circumstances of their loss or destruction."*

*4 The Claimant and the Regulatory Authority may, at their own expense, make copies
of the books and records of the Trusts.*"

**The Claimants' applications to strike out counterclaims**

41. The Claimants seek an order that each counterclaim be struck out on the ground that it
is both legally and factually hopeless. Their case is that the Court should make such an
order because that would enable the cases to be conducted expeditiously and effectively
and would be in accordance with the Court's overriding objective.

42. The relevant claims for loss and damage in each counterclaim are set out in paragraph
8 above.

43. The Claimants' case is that these counterclaims should be struck out or subject to
summary dismissal on the grounds that

   a) they do not amount to legally recognisable claims;
   b) no legally relevant duty owed to the Defendants by either Claimant is identified,
      and it is even more difficult to see how the Second or Third Defendants could
      have a cause of action against the Claimants;
   c) there is no explanation how any such duty has been breached;
   d) there is no explanation as to how the Defendants have suffered any loss as a
      result of any such breach of duty;
   e) there is no explanation of the actual loss suffered or how the sums claimed have
      been arrived at;
   f) there is no proper legal basis for the claim for "material and moral damages";
      and
   g) the Defendants have failed to comply with the requirement to provide
      information contained in the freezing order of 8 May 2019.

44. Further, even if the Defendants were owed a duty of some nature by the Claimants, the
Claimants submit that the counterclaims fail to identify how breach of such duty has
caused a loss giving rise to a right to damages in circumstances where HCW has been
subject to investigation into its own procedures. In any event, the counterclaims are

inconsistent with the Defendants' own submissions in which they reject the suggestion that the funds they hold on trust came from anything other than legitimate sources.

45. The Claimants' case is that allowing the counterclaims to continue would be of no benefit to the Defendants and a waste of resources for all parties and the Court.

46. On behalf of the Defendants Mr Abu Shaikha stated that the Defendants had suffered badly from the QFCRA's actions. HCW's business had closed and had lost its opportunity to make profits; there had been loss of reputation. It would, he submitted, be wrong to strike the claims out.

47. The Court concludes that the Claimants' criticisms of the counterclaims, which in their present state are mere assertions, are fully justified. If they wish to pursue them, the Defendants must explain the legal and factual basis of their claims, including the nature of the duty which they say the Claimants owed to the Defendants and how that duty has been breached and the actual damages they claim to have suffered because of any breaches by the Claimants. The damages which the Defendants seek are extraordinarily high and must be explained.

48. The Claimants also submit that the counterclaims should be struck out by reason of the HCW's failure to comply with the information provision of the injunctive order dated 8 May 2019. The Court rejects that submission: striking out a counterclaim is not generally a remedy for a breach of an injunctive order. The Court notes that the Third Defendant had apparently ceased to be a director of HCW before 8 May 2019.

49. The Court notes further that the Claimants' claims are brought against the Second and Third Defendants, both individuals, as well as HCW. The Claimants indicated an intention to pursue those claims even if the counterclaims are struck out. In all the circumstances of these two cases the Court concludes that it would be fair to give the Defendants an opportunity to provide a proper explanation of their counterclaims, as set out in paragraph 43 above, and evidence to support the counterclaims. Accordingly, the Court adjourns generally the Claimants' applications to strike out the counterclaims, with permission to restore the applications if the counterclaims are left in their present wholly unsatisfactory state. The above applies equally to the Claimants' application for summary judgment on the counterclaims.

**Failure to comply with the 8 May 2019 Freezing Order**

50. The injunctive order dated 8 May 2018 included a requirement that HCW inform the
    Claimants' lawyers, by 19 May 2019, of all its assets exceeding QAR 35,000 in value
    and to provide a summary explanation of how it has dealt with the funds transferred to
    it by the Claimant. HCW did not do so. The Claimants' lawyers wrote on 23 May 2019
    asking for immediate compliance. HCW has not responded.

51. Mr Hatton submits that it is important for the Claimant to know what has become of
    the money they transferred to HCW, particularly in circumstances where HCW's
    accounts appear to show less than what the Claimants believe should be the balances
    on the trust funds and where it appears there has been commingling of client funds with
    HCW monies.

52. The Court accepts these submissions, but no sanction is suggested by the Claimants
    except in relation to strike out, which for reasons set out above is not appropriate. The
    Claimants are entitled to take steps to enforce the injunction if it is practical to do so
    given that HCW seems to be defunct.

**Disclosure applications against QFCRA**

53. The Claimants seek an order requiring QFCRA to answer questions about the content
    of QFCRA's submissions to the Court made in January 2019 and to disclose various
    documents, being documents referred to in the Decision Notice and which formed the
    bases on which the QFCRA reached its conclusions. The QFCRA resisted the
    applications. However, Mr Hatton and Mr Jaffey were able to reach agreement as to
    some elements of the application and which agreement the Court approves (an order is
    not sought in this regard).

54. There remain in issue the Claimants' requests for the following material referred to in
    the Decision Notice, namely (a) the full transcripts of interviews conducted with various
    individuals relied on by QFCRA in reaching the conclusions set out in the Decision
    Notice and the documents referred to in them; (b) documents relating to the imposition

of the freezing order in February 2018 and (c) the Notice of Proposed Action issued to
HCW on 16 July 2018.

55. Mr Hatton submitted that fairness requires disclosure. Though the QFCRA had
disclosed redacted transcripts of interviews, he submitted that the Claimants needed to
see the transcripts in full as this would enable them to understand the basis on which
the QFCRA reached the conclusions and decisions set out in the Decision Notice (and
which the Claimants say are wrong).

56. The Court accepts Mr Jaffey's submission that it should be slow to order disclosure of
the full transcripts, because witnesses had been interviewed under compulsion, they
were required to answer questions, and there is no protection against self-incrimination.
Further, Article 19 of the Financial Services Regulations ("FSR") provides that the
QFCRA has a duty of confidentiality in relation to confidential information it receives,
and Article 77 of the FSR includes a power to withhold disclosure on a public interest
ground.

57. The Claimants also submit that they need to see these documents to enable them to
understand the source of the funds provided to HCW. The Court does not accept that
proposition at all. As the Claimants' position appears to be that money was transferred
to HCW on their behalf, they must know the source of the funds, but have chosen not
to disclose it.

58. So far as documents relating to the imposition of the freezing order in February 2018
and the Notice of Proposed Action issued to HCW on 16 July 2018 are concerned, the
Court accepts Mr Jaffey's submission that correspondence between regulators is not
normally disclosed by the regulator and that the Court should be slow to order
disclosure of information which might undermine a money laundering investigation,
including a possible criminal investigation. It is open to the Claimants to make their
applications to the domestic courts in Qatar.

59. The Claimants have not persuaded the Court that it would be right to make the order
the Claimants seek. The Court rejects the Claimants' applications for disclosure by the
QFCRA.

By the Court,

FranM/ box/l

Justice Frances Kirkham

Representation:

The Claimants were represented by Mr Simon Hatton, Serle Court, London.

The Defendants were represented by Mr Sami Abu Shaikha, Sami Abdullah Abushaikha Law Office, Doha.

The Interested Party was represented by Mr Ben Jaffey QC, Blackstone Chambers, London.

# EXHIBIT "2"



مـحـكـمـة قـطـر الـدولـيـة
ومـركـز تـسـويـة الـمـنـازعـات

**QATAR INTERNATIONAL COURT**
AND DISPUTE RESOLUTION CENTRE

In the name of His Highness Sheikh Tamim Bin Hamad Al Thani,
Emir of the State of Qatar

[2020] QIC (A) 2 on appeal from [2020] QIC (RT) 1

IN THE CIVIL AND COMMERCIAL COURT

OF THE QATAR FINANCIAL CENTRE

APPELLATE DIVISION

9 June 2020

Case Nos 5 and 6 of 2020 (on appeal from Case Nos 2 and 4 of 2019)

Between:

## HORIZON CRESCENT WEALTH LLC

Applicant

v

## QATAR FINANCIAL CENTRE REGULATORY AUTHORITY

AND

## QATAR FINANCIAL CENTRE AUTHORITY

Respondents

---

## JUDGMENT

---

Before:
Lord Thomas of Cwmgiedd, President
Justice Chelva Rajah SC
Justice Arthur Hamilton

## ORDER ON PERMISSION TO APPEAL

1. Permission to appeal against the judgment of the Regulatory Tribunal on the decisions of the Qatar Financial Centre Authority and Qatar Financial Centre Regulatory Authority is refused.

## JUDGMENT

1. In a written Application made on 3 May 2020, the Applicant seeks permission to appeal from the judgment of the Regulatory Tribunal (Justice Laurence Li SC, Justice Edwin Glasgow QC and Justice Gopal Subramanium) given on 9 March 2020, [2020] QIC (RT) 1. In its judgment the Regulatory Tribunal dismissed the appeal of the Applicant against the decision of the Qatar Financial Regulatory Authority (RA) dated 11 March 2019 and the Qatar Financial Centre Authority (QFCA) dated 6 October 2019. The RA and the QFCA, as Respondents, in their submission dated 18 May 2020 contend we should refuse permission.

2. The Applicant is incorporated in the Qatar Financial Centre (QFC) and licensed by the QFCA to carry out the non-regulated activity of trust administration. It is not authorised to undertake any regulated activity, including that of the business of asset management.

## CASE NO 2 OF 2019. THE DECISION OF THE RA

3. By its decision of 11 March 2019, the RA found that the Applicant (1) failed to put in place and follow the rules for anti-money laundering and combatting the financing of terrorism, (2) was carrying on the business of asset management, a regulated activity, without authorisation and (3) had provided information to the RA which was false, misleading or deceptive. The Applicant was accordingly in breach of a number of Regulations and Rules. The RA imposed a penalty of QAR 25 million for breach of the anti-money laundering and combatting the financing of terrorism rules and a penalty of

QAR 5 million for the other two matters. It ordered the payment of QAR 830,024 for
the costs and expenses of the investigation.

4. The Applicant appealed to the Regulatory Tribunal on the basis that the findings of the
RA were wrong. It contended that the funds transferred in were approved by the Qatar
National Bank and for legitimate reasons. It had at all times complied with the
regulations. The submissions did not address the specific findings made by the RA,
even in response to a direction by the Regulatory Tribunal that they should set out their
case. In a subsequent submission they contended that the Trust Regulations of the QFC
were *ultra vires* and that the proceedings should be stayed until the decision of the final
judgment of the criminal court.

5. The Applicant seeks permission to appeal the judgment of the Regulatory Tribunal in
respect of the decision of the RA on the basis that:

   a. The Applicant did not handle any money that was the proceeds of crime or tax
   evasion. It had procedures to combat money laundering and terrorist financing.

   b. As a licensed trust company, the assets it held were its assets. It managed those
   assets as the trust company as it was fully entitled to do as the assets were its
   assets and not those of the beneficiaries. It therefore was not carrying on the
   business of asset management.

   c. It had not provided the RA with any false or misleading information.

   d. The proceedings had to be stayed under Article 25 of the Criminal Procedures
   Code. The trust Regulations were *ultra vires*.

   e. The penalties imposed were excessive and unjust.

6. In our judgment there are no substantial grounds for considering that the decision of
the Regulatory Tribunal in upholding the decision of the RA was erroneous and would
result in substantial injustice, as set out in Article 35 (2) of the Qatar Financial Centre

Civil and Commercial Court Regulations and Procedural Rules and paragraph 27 of *Leonardo v Doha Bank Assurance Company* [2020] QIC (A) 1.

### a. Anti-money laundering and combatting the financing of terrorism

i. The Regulatory Tribunal was not in error in its findings in relation to the contravention of the anti-money laundering and combatting the financing of terrorism rules. The Regulatory Tribunal dealt clearly with the essentials of the breaches. Contrary to what is contended in the Application for Permission, it did not proceed on the basis that there had in fact been a dealing in funds unlawfully acquired abroad (whether in Venezuela or Costa Rica). The basis of its decision was that the Applicant had wholly failed to have regard to its responsibilities to put in place arrangements for due diligence before handling monies from abroad which were, on any view, highly suspect. That failure was illustrated by the three examples discussed in paragraphs 22-24 of the judgment of the Regulatory Tribunal. The Regulatory Tribunal carefully considered the case presented by the RA. No effective answer to that case was made by the Applicant. Although in paragraph 5.5 of the Application assertions are made that certain steps were taken, these assertions are of a most general kind and are not vouched. No explanation is given as to why these assertions were not made and, if true, vouched before the Regulatory Tribunal. What happened to the funds subsequently (diversion to Switzerland or theft) is irrelevant.

ii. The penalty of QAR 25 million for this failure was substantial but penalties for such failures are, justifiably, high in modern times and this penalty was imposed by a Tribunal expert in the field. The means of an offender are a legitimate consideration; but no information as to the Applicant's means was placed before the Regulatory Tribunal. The assertions now made (paragraph 6.1.1 of the Application) as to the amount being excessive do not, even at this stage, provide any particulars of the Applicant's means. A bald assertion that this penalty (combined with that imposed for certain other failures) "may reach to

confiscate all the money received by HCW as Trustee" is not good enough. The suggestion at paragraph 6.1.2 that the breaches were "minor" completely misses the point.

b. **Carrying on the regulated activity of asset management**

    i. In its Application for Permission to appeal the Applicant contended:

> "HCW is a QFC licensed trust company. As such it is not subject to QFCRA asset management rules. In summary a client settles funds into a trust and the funds become the legal property of the trust company ... HCW did in fact manage such assets, in the sense the assets belonged to them."

    ii. Articles 23 and 25 of the Financial Services Regulations, prohibit asset management to be carried on by way of business, unless authorised. Article 25(1)(A)(i) of the Financial Services Regulations provides:

> An activity is carried on by way of business if (A) the person who carries on the activity: (i) holds himself out to other persons as engaging in that activity...

    iii. It is not disputed by the Applicant that it managed assets, but it contended it did so as a trustee of the funds and not by way of the business of asset management.

    iv. The Regulatory Tribunal found at paragraphs 57-62 that the Applicant, in the marketing brochure issued by it, had held itself out as engaging in the activity of asset management under Article 25 (1) (A) (i) and not simply asset management in the course of the administration of a trust. The evidence set out in paragraphs 57-61 was sufficient for the Regulatory Tribunal to reach that finding on holding out.

v.   The Regulatory Tribunal was therefore entitled to find that the Applicant, when engaged in its activity of asset management, was carrying on the business of asset management and not asset management in the course of the administration of trusts. As it was doing so without authorisation, it was entitled to hold that the Applicant contravened Article 11 (2) of the QFC Law.

c.   **The provision of false and misleading information.**

i.   The Regulatory Tribunal made clear findings on the provision of false and misleading information at paragraphs 63-65 of its judgment.

ii.   The bare assertion (paragraph 5.4.1 of the Application) that the Applicant did not give deceptive information, or conceal information, is clearly not a proper ground for an appeal by way of review.

d.   **The stay of proceedings**

i.   Article 25 of the Criminal Procedures Code is concerned with the situation where an aggrieved party has the option under Qatari law of pursuing his claim either as an element of a criminal prosecution or as a claim before a civil court. There is nothing to suggest that there ever have been or are now pending any criminal proceedings in this matter.

ii.   The legal contentions that the appeal must be stayed under Article 25 of the Criminal Procedures Code are clearly without merit.

e.   **The Trust Regulations**

i.   The Trust Regulations were on their face enacted by the Minister under the power conferred by Article 9 of the QFC Law. No basis is suggested for these being *ultra vires*. Nor is any basis suggested as to why the Qatar

Family Law (an enactment of domestic Qatari law) is incompatible with or should affect the exercise of the Minister's Regulation-making power in relation to the QFC.

ii. The contention that the Trust Regulations were *ultra vires* is without merit. In any event it is unclear, even if the Trust Regulations were *ultra vires*, that this would assist the Applicant.

7. The application for permission to appeal against the decision of the Regulatory Tribunal in respect of the decision of the RA is accordingly refused.

**Case No 4 of 2019. The decision of the QFCA**

8. By its decision of 6 October 2020, the QFCA found that the Applicant had failed to hold client monies in segregated accounts, failed to identify client money received and breached various principles of fitness, properness, and proper conduct. It imposed a penalty of US $280,000.

9. There are, in our judgment, no substantial grounds for considering that the decision of the Regulatory Tribunal in upholding the decision of the QFCA was erroneous and would result in substantial injustice.

a. There was ample evidence for the findings made by the QFCA which were not challenged on appeal to the Regulatory Tribunal.

b. The challenge to the decision on the basis that the Trust Regulations were *ultra vires* and the proceedings should be stayed under Article 25 of the Criminal Procedures Code are without merit for the reasons we have set out above.

c. As to the penalty (of QAR 280,000) imposed by the QFCA for contravention of the duties incumbent on the Applicant (as a licensed but not regulated body) in relation to the holding of client monies, this is wholly distinct from the other

penalties imposed. There is no duplication. There is nothing to suggest that the amount of this penalty was in the circumstances excessive.

10. The application for permission to appeal against the decision of the Regulatory Tribunal in respect of the decision of the QFCA is accordingly refused.

By the Court,

Lord Thomas of Cwmgieed

President